IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

TAMMY BAUSLEY
o/b/o V. T. R.                                                                                    PLAINTIFF

v.                                   Civil No. 08-2093

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                           DEFENDANT

## MEMORANDUM OPINION

Plaintiff, Tammy Bausley, brings this action on behalf of her niece, V. T. R., seeking judicial review, pursuant to 42 U.S.C. § 405(g), of a decision of the Commissioner of the Social Security Administration (Commissioner), denying her application for child's supplemental security income (SSI), benefits under Title XVI of the Social Security Act.

**Background:**

Plaintiff protectively filed an application for SSI on V. T. R.'s behalf on February 24, 2006[1], alleging that V. T. R. is disabled due attention deficit hyperactivity disorder ('ADHD"), adjustment disorder with mixed anxiety and depressed mood, headache, and stomach aches. (. 69-79, 83, 101-116). An administrative hearing was held on October 3, 2007. (Tr. 439-506).  Plaintiff was present and represented by council.

The Administrative Law Judge ("ALJ"), in a written decision dated March 26, 2008, found that V. T. R.'s impairments were severe, but did not meet, medically equal, or functionally equal any listed impairment. (Tr. 20). Further, he concluded that V. T. R. had less than marked limitations in the areas of acquiring and using information, attending and completing tasks, and interacting and

---

[1]On March 15, 2004, plaintiff filed a prior application. (Tr. 220-228). On October 20, 2005, the ALJ determined that she was not disabled. This decision was appealed to the Appeals Council, where review was denied, but was not pursued further. (Tr. 236).

AO72A
(Rev. 8/82)

relating with others. (Tr. 23-26). He also found V. T. R. to have no limitations regarding her ability to move about and manipulate objects, care for herself, and health and physical well-being. (Tr. 26-82).

On June 25, 2008, the Appeals Council declined to review this decision. (Tr. 5-9). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 9, 11).

**Standard of Review:**

The court's review is limited to whether the decision of the Commissioner to deny benefits to the plaintiff is supported by substantial evidence on the record as a whole. *See Ostronski v. Chater*, 94 F.3d 413, 416 (8th Cir. 1996). Substantial evidence means more than a mere scintilla of evidence, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Pearles*, 402 U.S. 389, 401 (1971). The court must consider both evidence that supports and evidence that detracts from the Commissioner's decision, but the denial of benefits shall not be overturned even if there is enough evidence in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir. 1996).

In determining the plaintiff's claim, the ALJ followed the sequential evaluation process, set forth in 20 C.F.R. § 416.924. Under this most recent standard, a child must prove that she has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(c)(i); 20 C.F.R. § 416.906.

When passing the law, as it relates to children seeking SSI disability benefits, Congress decided that the sequential analysis should be limited to the first three steps. This is made clear in the House conference report on the law, prior to enactment. Concerning childhood SSI disability benefits, the report states:

> The conferees intend that only needy children with severe disabilities be eligible for SSI, and the Listing of Impairments and other current disability determination regulations as modified by these provisions properly reflect the severity of disability contemplated by the new statutory definition.... The conferees are also aware that SSA uses the term "severe" to often mean "other than minor" in an initial screening procedure for disability determination and in other places. The conferees, however, use the term "severe " in its common sense meaning.

142 Cong. Rec. H8829-92, 8913 (1996 WL 428614), H.R. Conf. Rep. No. 104- 725 (July 30, 1996).

Consequently, under this evaluation process, the analysis ends at step three with the determination of whether the child's impairments meet or equal any of the listed impairments. More specifically, a determination that a child is disabled requires the following three-step analysis. *See* 20 C.F.R. § 416.924(a). First, the ALJ must consider whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). If the child is so engaged, he or she will not be awarded SSI benefits. *See id.* Second, the ALJ must consider whether the child has a severe impairment. *See* 20 C.F.R. § 416.924(c). A severe impairment is an impairment that is more than a slight abnormality. *See id.* Third, if the impairment is severe, the ALJ must consider whether the impairment meets or is medically or functionally equal to a disability listed in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). *See* 20 C.F.R. § 416.924(c). Only if the impairment is severe and meets or is medically or functionally equal to a disability in the Listings, will it constitute a disability within the meaning of the Act. *See* 20 C.F.R. § 416.924(d). Under the third step, a child's impairment is medically equal to a listed impairment

3

if it is at least equal in severity and duration to the medical criteria of the listed impairment. 20 C.F.R. § 416.926(a). To determine whether an impairment is functionally equal to a disability included in the Listings, the ALJ must assess the child's developmental capacity in six specified domains. *See* 20 C.F.R. § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and, (6) health and physical well-being. *See* 20 C.F.R. § 416.926a(b)(1); *see also Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 722 n. 4 (8th Cir. 2005).

If the child claiming SSI benefits has marked limitations in two categories or an extreme limitation in one category, the child's impairment is functionally equal to an impairment in the Listings. *See* 20 C.F.R. § 416.926a(d). A marked limitation is defined as an impairment that is "more than moderate" and "less than extreme." A marked limitation is one which seriously interferes with a child's ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2). An extreme limitation is defined as "more than marked", and exists when a child's impairment(s) interferes very seriously with his or her ability to independently initiate, sustain or complete activities. Day-to-day functioning may be very seriously limited when an impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities. *See* 20 C.F.R. § 416.926a(e)(3).

**Discussion:**

Of particular concern to the undersigned is the ALJ's determination that V. T. R. had less than marked limitations in the areas of: (1) acquiring and using information; (2) attending and completing tasks; and (3) interacting and relating with others. The medical records indicate that V.

T. R. has been consistently diagnosed with ADHD and adjustment disorder with mixed anxiety and depressed mood. (Tr. 142-143, 168-170, 181, 188, 399-408, 412-413). At the time of administrative hearing, V. T. R. was 13 and in the 7th grade. (Tr. 490).

On January 15, 2004, V. T. R. underwent IQ testing. (Tr. 130). Her verbal IQ was 91, nonverbal 81, and composite IQ 85. (Tr. 130). Betty Gray, a school counselor, completed a psychoeducational evaluation. (Tr. 131-137). She noted that V. T. R. was cooperative, attentive, and appeared to understand all instructions given to her. Her responses were direct and her eye contact was good. Ms. Gray indicated that V. T. R.'s excessive withdrawal and poor intellectuality were significant behavioral problems. Further, her poor academics and concentration/attention difficulties were significant behavioral issues. She then reported that V. T. R. scored at a second grade level in letter and word identification, a second grade level in calculation, a third grade level in spelling, a second grade level in passage composition, and a second grade level in applied problems. Ms. Gray recommended that V. T. R.'s teachers structure all of her activities, offer remedial help, help her to develop independent study skill and good work habits, utilize a multisensory approach to instruction with repetition and drill of basic facts, preteach terminology and prerequisite skills at the beginning of each new unit, simplify instructions, teach V. T. R. to look for clues or key works, and help V. T. R. recognize common patters in math word problems. (Tr. 130-137).

On March 11, 2004, Dr. Denise Hendrickson, V. T. R. 's pediatrician, evaluated her for Attention Deficit Hyperactivity Disorder ("ADHD"). (Tr. 142-143). V. T. R. was reportedly making F's in the third grade. Plaintiff reported that she would sit and daydream, could not focus, gets frustrated, was not completing work in school, and has trouble understanding. The Burke's behavior

scale performed by the school rated her with significant behavioral issues in almost every area, including self blame, withdrawal, poor ego strength, poor academics, poor attention, and poor impulse control. Although she was having no behavior problems at school, V. T. R. was moody. Dr. Hendrickson diagnosed her with social dysfunction, school problems, and probable ADHD. She advised plaintiff to continue with counseling and to provide V. T. R. with a regular routine. Dr. Hendrickson then prescribed Adderall XR. (Tr. 142-143).

More recent records indicate that V. T. R. continued to experience academic difficulties and problems dealing with her peers. She was afraid of attending a new school due to the potential for peer conflicts. Although the ADHD medications initially allowed for improved concentration and better grades, V. T. R. experienced medication side effects, such as drowsiness, depression, and increased irritability, causing her to switch medications several times. On January 23, 2006, V. T. R. had a follow-up with Dr. Hendrickson. (Tr. 352-356). Her grades were failing, but no behavior problems were reported at school. Dr. Hendrickson noted that her Adderall prescription had not been filled since August. Plaintiff stated that V. T. R. was taking her medication at school, but often forgot to take it. Dr. Hendrickson reported that V. T. R. often failed to pay attention or made careless mistakes, had difficulty sustaining attention in tasks/play, did not seem to listen when spoken to, did not follow through on instructions, failed to finish tasks, had difficulty organizing tasks/activities, avoided tasks requiring sustained mental effort, blurted out answers before the question was completed, had difficulty awaiting her term, and interrupted and intruded on others. She also found that V. T. R. was very often distracted by extraneous stimuli and forgetful in daily activities. Further, Dr. Hendrickson indicated that V. T. R. had somewhat of a problem with reading, relationships with pears, participating in organized activities, and math problems. Her writing

6

abilities and relationship with her siblings were average. V. T. R.'s physical was also normal. Therefore, Dr. Hendrickson prescribed Lexapro. (Tr. 352-356).

On March 3, 2006, V. T. R. had continued problems with concentration, irritability, anger outbursts, and social withdrawal. (Tr. 363-364). She acknowledged feeling easily annoyed with her peers and reported that she tended to lose her temper quicker than her friends. V. T. R. had an irritable mood with others and often experienced outbursts with her peers. (Tr. 363-364).

On April 14, 2006, Ms. Murphree, a counselor at Western Arkansas Guidance Center, indicated that V. T. R. had continued difficulty with concentrating, irritability, anger outbursts, and social withdrawal. (Tr. 361-362). She stated that V. T. R. needed help resolving issues associated with loss and to begin to reinvest in relations with others and participate in age appropriate activities. V. T. R.'s behavior was cooperative and her mood pleasant. Ms. Murphree indicated that V. T. R. appeared very capable of making smart decisions but often acted impulsively when frustrated. (Tr. 361-362).

On May 3, 2006, Sandra Owens and Jennifer Ralphs, V. T. R.'s teachers completed a teacher questionnaire. (Tr. 290-297). They concluded that she had serious problems comprehending and doing math, learning new material, recalling and applying previously learned material, and applying problem solving skills in class discussions. The teachers also indicated that plaintiff had an obvious problem comprehending and following oral instructions, understanding school and content vocabulary, reading and/or comprehending written material, understanding and participating in class discussions, paying attention when spoken to directly, focusing long enough to finish assigned activities or tasks, carrying out multi-step instructions, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time. V. T. R. was also noted to have a

7

slight problem sustaining attention during play/sports activities, refocusing to task when necessary, carrying out single-step instructions, changing from one activity to another without being disruptive, completing class/homework assignments, working without distracting herself or others, making and keeping friends, expressing anger appropriately, providing organized oral explanations and adequate descriptions, expressing ideas in written form, responding to changes in her own mood, using appropriate coping skills to meet the daily demands of the school environment, and knowing when to ask for help. (Tr. 290-297).

On May 8, 2006, Ms. Murphree discussed with V. T. R. losing her temper at school and ways to cope with provocation. (Tr. 424).

On August 29, 2006, V. T. R. was starting a new school year. (Tr. 414). She was reportedly moody on Adderall and experienced headaches, while the Strattera made her depression worse. Dr. Price noted a stable mental status and recommended combining Concerta and Lexapro. (Tr. 414).

On September 8, 2006, V. T. R. reported peer conflicts. (Tr. 421). She continued to react strongly during squabbles and appeared sensitive to minor provocation. V. T. R. discussed her thoughts and feelings related to peer provocation and ways of handling conflicts without aggression. Ms. Murphree noted only partial progress toward V. T. R.'s goals. (Tr. 421).

On October 26, 2006, V. T. R. stated that she had recently been punished for her low grades and disrespectful behavior. (Tr. 420). She was able to describe steps for improving her grades including working with her intervention specialist and completing assignments. Ms. Murphree noted partial progress identifying anger, depression, and using talking as a coping mechanism rather than acting out. (Tr. 420).

On November 7, 2006, Susan Etskorn and Debra Lively completed a teacher questionnaire. (Tr. 307-314). They noted a serious problem with regard to V. T. R.'s ability to comprehend and do math problems. She also had an obvious problem reading and/or comprehending written material, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, and applying problem solving skills in class discussions. (Tr. 307-314).

On February 22, 2007, Barbara Durham, an advanced practical nurse evaluated V. T. R at Western Arkansas Guidance Center. (Tr. 412-413). She was experiencing problems with concentration, irritability, anger outbursts, and social withdrawal. Ms. Durham noted that V. T. R. had been off the Concerta for a while because it made her feel like a zombie. Plaintiff had put her back on Adderall, which helped with school, but it made her very moody and cranky. Her teachers reported continued poor behavior. Her mood was slightly depressed and calm and affect was broad and slightly flat. Ms. Durham determined that her depression was stable on Lexapro with no worsening of symptoms. However, her ADHD was poor (Tr. 412-413).

On March 12, 2007, Dr. Ann Martinazzo-Dunn evaluated V. T. R. for medication management. (Tr. 410-411). V. T. R. had not taken Concerta or Adderall in a while. The Adderall dosage in the morning reportedly made her irritable and the Concerta left her numb and not herself. Dr. Martinazzo-Dunn noted continued difficulties with concentration in school and depression. V. T. R. also reported problems falling asleep and frequent nightmares. In school, she had been in resource classes for the last three years; was getting additional help with math, reading, and spelling; and, was making Bs, Cs, and Ds. She was pleasant, had fair eye contact, exhibited a mildly

depressed mood, and a constricted and congruent affect. Her medications were noted to be fairly effective. (Tr. 410-411).

On May 14, 2007, Bethany Tosh, an advanced practical nurse, noted that V. T. R. was experiencing continued problems with concentration. (Tr. 406-408). She was in the sixth grade and suffered from attention deficit hyperactivity disorder and adjustment disorder with mixed anxiety and depressed mood. V. T. R. was reportedly in a lot of trouble at school for talking, misplacing folders, and lying. She had been in detention twice since her last medical management appointment. Her grades had improved somewhat, but remained Bs, Cs, and Fs. V. T. R. had complained of feeling a little depressed at her previous visit, so her Strattera dosage was increased. No side effects were reported, and she indicated that it helped "a little". However, she was still experiencing problems with compliance, now taking her medication 5 days per week. Ms. Tosh increased V. T. R.'s Strattera dosage again and advised her to continue Lexapro and Rozerem. She then noted that V. T. R.'s mood was euthymic, her affect broad and congruent, and her judgment and insight fair. (Tr. 406-408).

On May 23, 2007, V. T. R. was exhibiting increased negative behavior at school and more anger. (Tr. 418). Ms. Murphree noted that she was cooperative and had a dysthymic mood. (Tr. 418).

On August 6, 2007, a medical certificate of children with serious emotional disturbance was completed. (Tr. 399-406). It is not clear which physician completed the form, but it does indicate that she was suffering from adjustment disorder with mixed anxiety and depressed mood, as well as educational problems. She continued to have problems with concentration, inattentiveness, and

irritability that she coped with fairly well. V. T. R. was worried about attending a new school and how it could bring about additional peer conflicts. (Tr. 399-406).

On October 2, 2007, V. T. R.'s grades were as follows: F in math, F in history, F in science, B in language arts, B in band, A in PE, and C in keyboarding. (Tr. 344-348). We note that V. T. R. was in remedial math and language arts. (Tr. 491-492).

Given the aforementioned evidence, we can not say that the ALJ"s determination is supported by substantial evidence. While V. T. R. did initially respond well to the medications, her most recent grade reports indicate continued problems acquiring and using information and attending and completing tasks. Counseling sessions also reveal continued problems dealing with her peers. In fact, V. T. R. testified that she had only 3 friends. (Tr. 494). Therefore, we believe that remand is necessary to allow the ALJ to further evaluate V. T. R.'s disability claim. *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (holding that the ALJ is not free to ignore medical evidence, rather must consider the whole record).

We also note there are no RFC assessments completed by V. T. R.'s treating doctor or counselor. Generally, the opinion of a consulting physician who examined the plaintiff once or not at all does not constitute substantial evidence. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). As such, we believe that remand is necessary. The ALJ is directed to address interrogatories to V. T. R.'s treating physician and counselor, asking them to review V. T. R.'s medical records during the relevant time period; to complete an RFC assessment regarding V. T. R.'s capabilities during the time period in question; and, to give the objective basis for their opinions, so that an informed decision can be made regarding V. T. R.'s ability to perform basic work activities on a

11

sustained basis during the relevant time period in question. *Chitwood v. Bowen*, 0788 F.2d 1376, 1378 n.1 (8th Cir. 1986); *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985).

### III. Conclusion:

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence, and the denial of benefits to V. T. R. should be reversed and this matter remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this 15th day of September 2009.

/s/ *J. Marschewski*
HONORABLE JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE